**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Carlos Fernando Romero,

Plaintiff,

v.

Gregory Hernandez, et al.,

Defendants.

No. CV 16-03681-PHX-DGC (BSB)

**ORDER**

Plaintiff Carlos Fernando Romero, who is currently confined in the Arizona State Prison Complex-Lewis in Buckeye, Arizona, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants City of Phoenix Police Officers Hernandez, Kerger, Smoke, Howard, Happeny, Bill, Wright, Fay, and Peelman move for summary judgment. Doc. 65. Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), and he opposes the motion. Docs. 67, 68. The Court will grant the motion for summary judgment and terminate this action.

**I.    Background.**

In his one-count complaint, Plaintiff claims that the defendant officers used excessive force on him when he pulled over to the side of the freeway and exited his vehicle after a police helicopter shined a spotlight on his car. Doc. 1 at 5. Plaintiff alleges that he was standing by the side of the road talking on his cellphone when a police

canine attacked him, and while he was being dragged to the ground, multiple officers ran up and began to beat him in the face with closed fists "until [he] was knocked unconscious." *Id.* Plaintiff alleges that he was awakened six hours later in the hospital and told that he needed to be rushed into surgery. *Id.* He claims he suffered permanent nerve damage to his left leg, a severed artery that had to be surgically repaired, numerous lacerations to his face, and has to walk with the assistance of a cane. *Id.* Plaintiff does not know specifically which officers "were involved in the beating," but he alleges that all nine Defendants "were the arresting officers [and] someone could have stopped it." *Id.* On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an excessive use of force claim against all Defendants and required them to answer the claim. Doc. 11.

Defendants now move for summary judgment on the grounds that Defendant Officers Peelman, Happeny, Howard, and Sergeant Fay were not involved in the arrest; the evidence does not support an excessive use of force claim; and Defendants are entitled to qualified immunity. Doc. 65.

**II.    Summary Judgment Standard.**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material (a fact that might affect the outcome of the suit under the

governing law) and that the dispute is genuine (the evidence is such that a reasonable jury could return a verdict for the nonmovant). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in his favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968), but he must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the Court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The Court must consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.    Facts.**

Plaintiff failed to comply with the Court's February 20, 2018, order and Local Rule 56.1(b), requiring that he provide a separate statement of facts with numbered paragraphs corresponding to the paragraphs in Defendants' Statement of Facts, "indicating whether [he] disputes the statement of fact set forth in that paragraph" and including "a reference to the specific admissible portion of the record supporting the party's position." Doc. 67 at 2 (quoting LRCiv 56.1(b)). Instead, Plaintiff provided several pages of arguments with references to copies of two police reports that he claims contradict each other, and a number of photographs that he claims show the severity of his injuries. Doc. 68. Where Plaintiff points to relevant admissible evidence, the Court has considered this evidence. Additionally, because a verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence, the Court will consider the allegations in Plaintiff's complaint. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *Schroeder*

*v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995). Where Defendants' facts are not clearly contradicted by this evidence or other evidence in the record, the Court will consider the facts undisputed.

At approximately 12:20 a.m. on December 20, 2015, Phoenix Police dispatch broadcasted an armed robbery call over the radio. Doc. 66 (Defs.' Statement of Facts) ¶ 2. The dispatcher advised that the suspect, later identified as Plaintiff, was armed with a handgun and had fled the scene of the robbery in a white Lincoln Navigator. *Id.* ¶ 3. About ten minutes later, non-defendant Officer Mead broadcasted over the canine handler frequency that he was behind the suspect's vehicle, gave his location, and requested an air unit. *Id.* ¶ 4.

The defendant officers, all of whom are canine handlers, heard Officer Mead's broadcast and began to travel in Officer Mead's direction. *Id.* ¶ 5. While Officer Mead was behind the suspect vehicle, he broadcasted the license plate number and a dispatcher indicated from a records check that the vehicle was stolen. *Id.* ¶ 6. Defendant Wright, who was the closest to Officer Mead's location, responded that he observed Officer Mead driving directly behind the stolen vehicle with at least two other patrol cars behind him. *Id.* ¶ 7. Officer Mead, Defendant Wright, and the other patrol cars activated their lights to initiate a traffic stop of the suspect vehicle. *Id.* ¶ 8.

Plaintiff turned into a gas station and stopped to let a female passenger out of the car. He then proceeded through the gas station and continued driving westbound on Indian School Road. *Id.* ¶ 9. Officer Mead stopped to secure the female passenger while Defendant Wright continued to follow Plaintiff, and the other vehicles backed off and let the air unit follow the suspect vehicle. *Id.* ¶ 10. After patrol officers arrived at the gas station to take custody of the female passenger, Officer Mead resumed driving in the direction of the stolen vehicle. *Id.* ¶ 11.

The air unit continued to broadcast Plaintiff's location and the defendant officers continued to follow from a distance. *Id.* ¶ 12. Plaintiff travelled westbound on Interstate 10 and then exited onto northbound Loop 101. *Id.* ¶ 13. As Plaintiff neared the

Camelback Road exit of Loop 101, he stopped the stolen vehicle along the concrete barrier between the northbound and southbound lanes, exited from the driver's side door, jumped over the concrete barrier, and headed westbound across the southbound lanes of Loop 101. *Id.* ¶ 14.

The defendant officers exited at Camelback Road and made u-turns onto the Camelback Road onramp leading to the southbound side of Loop 101. *Id.* ¶ 15. At this point, the air unit directed all ground units to use caution because the air officers observed Plaintiff running with an object in one of his hands. *Id.* ¶ 16.

As Defendant Hernandez drove onto the Camelback Road onramp leading towards southbound Loop 101, he observed Plaintiff run directly towards him on the southbound shoulder and then run down the gravel embankment on the west side of the freeway. *Id.* ¶¶ 17, 18. Defendant Hernandez immediately parked his vehicle on the side of the onramp, exited the vehicle, retrieved his canine "Murphy" out of the rear passenger compartment, and gave a command for Plaintiff to stop, which Plaintiff ignored. *Id.* ¶¶ 19-20. Defendant Hernandez then commanded Murphy to apprehend Plaintiff, and Defendant Kerger, who had also arrived on the scene, broadcasted over the radio that a canine had been deployed so that all officers would be aware. *Id.* ¶¶ 19, 21-22.

Murphy ran towards Plaintiff, slipped past him, then turned and latched onto Plaintiff's left lower leg. *Id.* ¶ 23; Doc. 66, Ex. 3 (Hernandez Aff.) ¶¶ 18-19; Ex. 4 (Kerger Aff.) ¶ 15. Defendant Hernandez immediately ran down the embankment after Murphy, and Defendant Kerger and other canine officers followed. *Id.* ¶ 24.

Defendant Hernandez saw Plaintiff fall to his knees facing him and saw an object in one of his hands that he believed to be a gun. *Id.* ¶ 25. Defendant Hernandez then dove at Plaintiff, causing Plaintiff to fall backwards, and Defendant Hernandez landed some distance away. *Id.* Defendant Hernandez quickly stood up and saw that Murphy had maintained his bite on Plaintiff's leg, and Defendants Bill, Wright, Kerger, and Smoke immediately moved in to arrest Plaintiff. *Id.* ¶ 26.

When Defendant Hernandez saw that the other defendants had control of Plaintiff, he removed Murphy from the bite on Plaintiff's leg and returned Murphy to his patrol car. *Id.* ¶¶ 27−29.

The parties dispute the amount of force used to arrest Plaintiff. Based on the affidavit testimony of the arresting officers, the only use of force was Murphy's bite to Plaintiff's leg, which lasted for less than one minute. *Id.* ¶ 28; Hernandez Aff. ¶¶ 25-26; Kerger Aff. ¶¶ 19-20; Doc. 66, Ex. 5 (Wright Aff.) ¶¶ 21-22; Ex. 6 (Bill Aff.) ¶ 15; Ex. 7 (Smoke Aff.) ¶¶ 18-19. According to the allegations in Plaintiff's complaint, Murphy "tore into" Plaintiff's calf, and Plaintiff was going to the ground with his hands in the air when "numerous officers" ran at him and beat him in the face with closed fists until he was "knocked unconscious." Doc. 1 at 5.

Defendants Peelman, Happeny, Howard, and Fay had no involvement in the arrest or in taking Plaintiff into custody. Officer Peelman gave Plaintiff his *Miranda* warnings after Plaintiff was handcuffed, and Officer Happeny walked down and helped escort Plaintiff up the Loop 101 embankment, where the Phoenix Fire Department treated Plaintiff for his injuries. Doc. 66 ¶¶ 30-31; Doc. 66, Ex. 8 (Happeny Aff.) ¶¶ 14, 20; Ex. 9 (Howard Aff.) ¶¶ 11, 14; Ex. 10 (Peelman Aff.) ¶ 12. Sergeant Fay arrived on the scene after the paramedics were already attending to Plaintiff's injuries. Doc. 66, Ex. 11 (Fay Aff.) ¶ 11.

Plaintiff was alert and talking when the Phoenix Fire Department arrived at 12:57 a.m. and when he was subsequently taken to the West Valley Hospital at the Abrazo West Campus (AWC). *Id.* ¶¶ 31, 33. According to the Phoenix Fire Department EMS Incident Report, Plaintiff was "in handcuffs with Phx P.D. p[atien]t ran from P.D. and was bit by P.D. K.9. p[atien]t in P.D. custody admits to ETOH no other illicit drugs p[atien]t crying and whining like a little kid." *Id.* ¶ 34; Doc. 66 at 77. The EMS Incident Report further noted that Plaintiff was alert and oriented to person, place, time, and events. Doc. 66 at 77.

According to the Emergency/Urgent Care records from AWC, Plaintiff was seen at 1:35 a.m. for a "[d]og bite of the left lower leg," at which time he was noted to be "[a]lert, no acute distress." Doc. 66 at 85, 86. The "History of Present Illness" (HPI) section of the intake records does not indicate that Plaintiff stated that he had been beaten by officers or lost consciousness; it reports only that Plaintiff fled in his car, police chased him, he exited his car on Loop 101, and he ran across the freeway and down the embankment when a canine was released and bit him on the calf. *Id.* at 85. According to an AWC Consultation Report, Plaintiff's chief complaint was "[l]eft lower leg dog bite," for which he elected to proceed with wound care, including "formal irrigation and debridement" in the operating room. *Id.* at 81. He "denies issues elsewhere," and was again noted to be in "no acute distress" and to be "awake, alert and oriented x4." *Id.* at 82. The "Physical Exam" section of these records states that Plaintiff's head was "atraumatic" and that Plaintiff had "some minor abrasions with swelling over the right forehead," but that "no wound care in terms of sutures were required." *Id.* The "Review of Symptoms" section indicates "[a] 14-point review and negative [for symptoms] except as documented in the [HPI]." *Id.*

On December 30, 2015, Plaintiff was processed into the Maricopa County Jail and provided responses to questions on the Maricopa County Correctional Health Services (CHS) Screening Form, but did not claim to have been beaten by officers. Doc. 66 ¶ 38; Doc. 66 at 108-13. On December 31, 2015, Plaintiff also provided answers during a CHS Health Assessment. Doc. 66 ¶ 39; Doc. 66 at 93-102. The "Subjective" section of the Intake Provider Assessment form notes that "[d]uring arrest [Plaintiff] sustained a K9 dog bite to the left calf. He also hit his head on the ground." Doc. 66 at 102.

On January 7, 2016, a grand jury indicted Plaintiff for one count of armed robbery, a class 2 felony. Doc. 66 ¶ 32; Doc. 66 at 11-12. The indictment stated that Plaintiff, together with a female accomplice, "used threats or force" to coerce the robbery victim to surrender property against his will and that the charged offense is a dangerous felony because it "involved the discharge, use, or threatening exhibition of a handgun, a deadly

weapon or dangerous instrument and/or the intentional or knowing infliction of serious physical injury" upon the victim. Doc. 66 at 12. Plaintiff pled guilty to this charge on May 24, 2016. Doc. 66 ¶ 32; Doc. 66 at 70.

**IV. Discussion.**

The use of excessive force by police officers in the course of an arrest can violate the arrestee's Fourth Amendment right to be free from unreasonable seizures. *See White by White v. Pierce Cty.*, 797 F.2d 812, 816 (9th Cir. 1986). The Fourth Amendment does not prohibit the use of reasonable force. *Tatum v. City & Cty. of S.F.*, 441 F.3d 1090, 1095 (9th Cir. 2006). Whether the force was excessive depends on "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Tatum*, 441 F.3d at 1095; *Lolli v. Cty. of Orange*, 351 F.3d 410, 415 (9th Cir. 2003). The Court must balance the nature and quality of the intrusion against the countervailing governmental interests at stake. *Graham*, 490 U.S. at 396; *Lolli*, 351 F.3d at 415. Moreover,

> [t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . . "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment.

*Graham*, 490 U.S. at 396 (citations omitted). "Whether a particular use of force was 'objectively reasonable' depends on several factors, including the severity of the crime that prompted the use of force, the threat posed by a suspect to the police or to others, and whether the suspect was resisting arrest." *Tatum*, 441 F.3d at 1095 (citing *Graham*, 490 U.S. at 396).

### A.     Defendants Peelman, Happeny, Howard, and Fay.

Defendants first argue that Officers Peelman, Happeny, Howard, and Fay are entitled to summary judgment because there is no evidence that they participated in Plaintiff's arrest or were present during the alleged assault.  Doc. 65 at 6-8.  Plaintiff acknowledges in his complaint that he does not know "which officers were involved in the beating."  Doc. 1 at 5.  The only evidence on record with respect to these Defendants shows that none of them was involved in apprehending and arresting Plaintiff.  *See* Doc. 66 ¶¶ 30-31.

Defendants have met their initial burden on summary judgment of showing that these officers did not violate Plaintiff's Fourth Amendment rights, and Plaintiff fails to produce any evidence that would create a genuine issue of material fact.  The Court will grant the motion for summary judgment with respect to Defendants Peelman, Happeny, Howard, and Fay.

### B.     Defendants Hernandez, Bill, Kerger, Smoke, and Wright.

Defendants argue that Defendants Hernandez, Bill, Kerger, Smoke, and Wright are entitled to summary judgment because the force they used to apprehend and arrest Plaintiff was reasonable under the circumstances.  Doc. 65 at 8-11.)  They further argue that Plaintiff's version of events, including that he was knocked unconscious for six hours, simply cannot be reconciled with the uncontroverted evidence in the record.  *Id.* at 11-12.

The Court construes Plaintiff's verified complaint as an affidavit in opposition to the motion for summary judgement, but Plaintiff's allegations, beginning with what led up to his stop and the defendant officers' alleged use of force, are too vague and incomplete to controvert Defendants' detailed and thoroughly supported facts regarding these same events.  For example, Plaintiff does not allege, but also does not dispute, that he was suspected of committing armed robbery or that he was driving a stolen vehicle with numerous police cars in pursuit while a police helicopter tracked him by spotlight. He does not dispute that when he "pulled to the side of the freeway" this was actually

alongside the middle concrete barrier between the north and southbound lanes of Loop 101. Doc. 1 at 5. He does not dispute that he climbed over the barrier, crossed the southbound lanes of traffic while being tracked by helicopter spotlight, was spotted running toward Defendant Hernandez on the southbound shoulder, and then began running down the gravel embankment before, as he alleges, "without warning, a canine was released." *See id.*

The complaint's piecemeal account of Plaintiff's arrest does not controvert the facts established by Defendants, including the severity of the crime that prompted the use of force, the threat Plaintiff posed to the defendant officers or others, and whether Plaintiff was resisting arrest. *Graham*, 490 U.S. at 396. The Court will rely on Defendants' undisputed facts and evidence in assessing these factors.

### 1. The Severity of the Crime.

The evidence shows that when Plaintiff was spotted by Officer Mead, he was driving a stolen vehicle that matched the white Lincoln Navigator that police dispatchers identified as being driven by a fleeing armed robbery suspect. Upon identifying this vehicle, Officer Mead conveyed these facts to the defendant officers over the canine radio frequency. Doc. 66 ¶¶ 4−6. The undisputed evidence also shows that Plaintiff was indicted by a grand jury for armed robbery, a violent felony, and pled guilty to that charge. *Id.* ¶ 32. A substantial governmental interest was at stake in Defendants' apprehension of Plaintiff.

### 2. The Threat Posed to Police and Others.

Plaintiff had just committed a violent crime; he reportedly had a gun; and air unit officers who were tracking him with a spotlight warned ground unit officers that they had just observed Plaintiff running with an unknown object in his hand. *Id.* ¶16. After Murphy took Plaintiff to the ground, Defendant Hernandez observed Plaintiff holding an object in one of his hands that appeared to be a gun. *Id.* ¶ 24. These undisputed facts show that a reasonable officer in Defendants' situation would have perceived an immediate need to use force to stop the potentially lethal threat posed by Plaintiff.

### 3. Whether the Suspect Was Resisting Arrest.

Plaintiff had just committed an armed robbery and had fled in a stolen vehicle. He then led police on a wide-ranging pursuit over public roads and freeways while being tracked by a police helicopter. He abandoned the stolen vehicle and fled across the southbound lanes of the freeway. When Defendant Hernandez commanded Plaintiff to stop, he ran down the gravel embankment on the side of Loop 101.

Plaintiff was actively resisting arrest. When combined with the severity of his crime and the threat he posed to the officers, Defendants had a compelling need to use force to apprehend Plaintiff and secure his arrest.

### 4. The Type and Amount of Force Used.

The evidence shows that Defendant Hernandez released Murphy after Plaintiff refused to stop, and that the dog brought Plaintiff down with a single bite to the lower left leg. *Id.* ¶¶ 20-25. Then, believing Plaintiff had a gun in his hand, Defendant Hernandez dove at Plaintiff, causing him to fall backwards. *Id.* ¶ 25. As soon as Hernandez saw that the other Defendants had secured Plaintiff, Hernandez had Murphy release the bite. *Id.* ¶ 27. Murphy's bite lasted less than one minute and was the only physical force used against Plaintiff. *Id.* ¶ 28.

Plaintiff's allegations in the complaint tell a very different story about the amount of force the defendant officers used, but unlike Plaintiff's allegations about his own actions, he does not simply leave out pertinent facts. Instead, Plaintiff affirmatively alleges that Defendants beat him with closed fists until he became unconscious, after which he required emergency surgery and did not regain consciousness for six hours. Doc. 1 at 5. These bare allegations are insufficient, in light of the abundance of additional undisputed evidence about the extent of Plaintiff's injuries, to create a genuine issue of material fact that Defendants used more force than was reasonably necessary.

The objective evidence flatly contradicts Plaintiff's contentions concerning his injuries, including that he lost consciousness, had to be rushed into surgery, and only awoke in the hospital six hours later. Based on the Phoenix Fire Department's EMS

Incident Report, Plaintiff was awake and fully alert after his arrest. Doc. 66 at 77. Medical records from AWC also note that when Plaintiff arrived he was alert, not in any acute distress, and his only medical complaint was a dog bite. *Id.* at 82, 85, 86. Subsequent CHS assessments of Plaintiff's physical condition mention only the dog bite and some abrasions to the forehead which resulted from him "hit[ting] his head on the ground." *Id.* at 102. A reasonable jury simply could not find that Defendants used the type and amount of force Plaintiff claims.[1] *See Anderson*, 477 U.S. at 250. Plaintiff fails to create a genuine issue for trial that the officers used excessive force, and the Court will grant the motion for summary judgment as to Defendants Hernandez, Bill, Kerger, Smoke, and Wright.[2]

**V.    Motion to Strike.**

Defendants filed a motion to strike an unauthorized sur-reply. Doc. 75. The Court has reviewed Plaintiff's additional response (Doc. 74) and finds that it provides no citations to relevant evidence that would support Plaintiff's excessive use of force claim. The Court has therefore not considered this additional response in its summary judgment analysis and will deny Defendants' motion to strike as moot.

**IT IS ORDERED:**

1.    The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 65) and Defendants' Motion to Strike (Doc. 75).

2.    Defendants' Motion to Strike (Doc. 75) is **denied as moot**.

_____

[1] The photographs Plaintiff attaches to his Response that were purportedly taken at AWC (Doc. 68 at 15-39) are not authenticated or discussed by any medical personnel, are difficult to interpret, and are insufficient, on their own, to create a genuine question of material fact that Plaintiff's injuries were more serious than the hospital reports indicate.

[2] Because the Court finds that Plaintiff cannot show that Defendants violated his Fourth Amendment rights, the Court need not discuss Defendants' alternative qualified immunity argument.

3.   Defendants' Motion for Summary Judgment (Doc. 65) is **granted**, and the action is **terminated** with prejudice.   The Clerk of Court must enter judgment accordingly.

Dated this 13th day of August, 2018.

_David G. Campbell_
David G. Campbell
Senior United States District Judge